IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SHANNON L. GRANT,

    Plaintiff,

v.                                                  Civil Action No. 1:10cv85
                                                  (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

### I. Procedural History

Shannon L. Grant ("Plaintiff") filed applications for SSI and DIB on April 4, 2006, alleging disability since March 1, 2006, as to SSI, and November 1, 2004, as to DIB, due to back injuries, arthritis, stomach problems, bowel problems, and depression (R. 104, 107, 126). The state agency denied Plaintiff's applications initially and on reconsideration (R. 45-48). Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ") held on February 5, 2008, in Morgantown, West Virginia., and at which Plaintiff, represented by Twila Robinson, a non-attorney

advisor, and Larry Ostrowski, a vocational expert ("VE") testified (R. 19-44). On April 29, 2008, the ALJ entered a decision finding Plaintiff was not disabled (R. 9-18). On April 21, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on December 23, 1963, and was forty-four (44) years old at the time of the ALJ's decision (R. 18, 107). Plaintiff has a seventh-grade education; she left school at the age of fifteen (15). Plaintiff attended special education classes for speech and reading. Plaintiff received no special job training; she attended no trade or vocational schools (R. 133). She was "grandmothered in" as a certified nurse assistant (R. 127). Plaintiff's past work included that of a certified nurse assistant and a care giver (R. 127, 139-42).

On March 1, 2004, Plaintiff presented to Doctor's Quick Care for follow-up treatment for back pain. Plaintiff reported her pain was achy, throbbing, which was exacerbated by arm movement. Plaintiff was diagnosed with lumbar strain and prescribed Bextra (R. 232-33).

On April 26, 2004, Plaintiff presented to Doctor's Quick Care for a refill of her prescription for Ambien. She complained of not sleeping, leg numbness, and low back pain with "radiation down both legs." Plaintiff requested a MRI. Plaintiff reported she had an x-ray made on March 1, 2004. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, seventy-five (175) pounds. Plaintiff was diagnosed with insomnia and low back pain with radiation (R. 230-31).

Plaintiff's May 9, 2004, MRI of her lumbar spine was unremarkable (R. 321).

On June 6, 2004, Plaintiff was treated at Doctor's Quick Care for complaints of swelling and pain in feet and legs, increased hypertension, dizziness, and stress. Plaintiff's height was five feet,

seven inches (5'7"); her weight was one-hundred, seventy-seven (177) pounds). She was diagnosed with insomnia, edema of legs and hands and anxiety. She was prescribed Ambien. She was instructed to schedule an appointment at Summit Center (R. 228-29).

On July 28, 2004, Plaintiff presented to Doctor's Quick Care for a refill on Ambien and medication for "fluid." Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, sixty-nine pounds. She was diagnosed with insomnia, peripheral neuropathy, "pedal edema" and fatigue (R. 226-27).

On August 25, 2004, Plaintiff was treated at Doctor's Quick Care for vaginal discharge, numbness and swelling in her legs, increased joint pain, especially in knees, ankles, and hips, and hand swelling. Plaintiff stated her condition was exacerbated by bending. Plaintiff listed the severity of her conditions as "moderate." Plaintiff's height was listed as five feet, five inches (5'5"); her weight was one-hundred, twenty-seven (127) pounds. Plaintiff was diagnosed with polyarthralgias, urinary tract infection, and insomnia. Plaintiff was not prescribed medication (R. 224-25).

On September 8, 2004, Plaintiff was treated for insomnia and polyarthralgias at Doctor's Quick Care. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, seventy (170) pounds. She was diagnosed with vaginal bleeding and polyarthralgias. She was instructed to schedule an appointment with a gynecologist and rheumatologist (R. 222-23).

In 2005, Plaintiff presented to Dr. Medina with complaints of reflux and hiatal hernia. Plaintiff's blood pressure was 113/67. She weighed one-hundred, seventy-six (176) pounds. Plaintiff's height was five feet, seven and one-half inches (5'7 ½"). Plaintiff stated she medicated with Prevacid. Dr. Medina diagnosed diverticulosis (R. 202).

On January 6, 2005, Plaintiff was treated at Doctor's Quick Care for nausea, vomiting, left arm numbness, and left leg pain. Plaintiff stated her symptoms "stay[ed] about the same all day." Plaintiff reported decreased appetite. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, seventy-two (172) pounds. She was diagnosed with vomiting, appetite loss, and paresthesia in "arms," hair loss, insomnia, throat pain. She was prescribed Cipro and Remeron. She was instructed to continue medicating with Phenergan (R. 220-21).

On January 13, 2005, Plaintiff underwent an upper gastrointestinal series. It showed a "sliding hiatus hernia with mild gastroesophageal reflux" (R. 207, 322).

On February 1, 2005, a transvaginal ultrasound was positive for "[two] simple appearing cysts" on the right ovary (R. 324, 325, 326).

On February 1, 2005, Plaintiff presented to Doctor's Quick Care for follow-up care for upper gastrointestinal complaints. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, seventy-eight (178) pounds. Plaintiff was diagnosed with muscle spasm in her cervical spine and cyst on ovary. She was not prescribed medication (R. 218-19).

On February 18, 2005, Plaintiff's United Hospital Center record showed she had hypertension and medicated with Prevacid, Remeron and Mylanta. Plaintiff smoked one-half packages of cigarettes a day. It was noted Plaintiff had "no clinical changes" (R. 305).

Plaintiff's February 21, 2005, chest x-ray was normal (R. 323).

On February 22, 2005, Dr. Medina performed an esophagogastroduodenoscopy of Plaintiff. Dr. Medina's diagnosis was for small hiatal hernia (R. 208-09, 307-08).

On March 14, 2005, Plaintiff underwent an exploratory laparotmy for chronic pelvic pain. Dr. McCammon performed the procedure. She was released on March 17, 2005. She was "doing

4

well and tolerating a regular diet." Plaintiff's blood pressure was 102/66. Her height was five-feet, seven inches (5' 7"); she weighed one-hundred, eighty (180) pounds. She was prescribed Percocet and Premarin (R. 182-86, 196-98)).

On April 22, 2005, Plaintiff presented to Doctor's Quick Care for follow-up treatment for GERD and hypertension. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, seventy-nine, and three-quarters (179 3/4) pounds. Plaintiff was diagnosed with fatigue, hypertension and GERD. She was prescribed Prevacid (R. 216-17).

On May 13, 2005, Plaintiff had a bone density study; it was normal (R. 327-28).

On January 5, 2006, Plaintiff was treated at Doctor's Quick Care for lower abdominal pain and chronic arthritis pain. Plaintiff listed her pain as moderate; she said weather and daily activities exacerbated her pain. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, ninety (190) pounds). Plaintiff was diagnosed with abdominal pain and arthralgias. She was prescribed Advair and Lortab (R. 214-15).

On January 5, 2006, an x-ray of Plaintiff's abdomen was normal (R. 313).

On January 19, 2006, Plaintiff returned to Dr. Medina with complaints of feeling as if food and pills got "'stuck' in her throat." Dr. Medina diagnosed diverticulosis (R. 204).

Plaintiff's January 19, 2006, urinalysis was normal (R. 340).

On January 27, 2006, Plaintiff presented to United Hospital Center. The "history of present illness" included rheumatoid arthritis, hypertension, and fibromyalgia. Her weight was listed as one-hundred, eighty-eight (188) pounds; her height was five-feet, seven inches (5'7") (R. 303, 309). It was noted that Plaintiff's emotional state was normal and she was alert and oriented. It was noted that Plaintiff had full ranges of motion in neck flexion and head extension (R. 304, 310).

On January 31, 2006, Dr. Medina performed an esophagogastroduodenoscopy with biopsy of Plaintiff's stomach. He diagnosed gastritis (R. 205-06, 311-12).

On March 13, 2006, Plaintiff was treated at Doctor's Quick Care for cough, congestion, and increased chronic back pain. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, eighty-eight (188) pounds. She was diagnosed with back pain, neck pain, fatigue, and sinus congestion. She was prescribed Cipro and Lortab; she was provided vitamin B12 (R. 212-13).

Plaintiff's March13, 2006, cervical spine an x-ray showed C5-C6 abnormalities, "probably postoperative change/ankylosis . . . [o]therwise no significant abnormality" (R. 314, 315).

Plaintiff's March13, 2006, x-ray of her thoracic spine was unremarkable (R. 316).

On May 3, 2006, Plaintiff was treated at Doctor's Quick Care for pain and swelling in her left hand. Plaintiff's height was five feet, seven inches (5'7"); her weight was one-hundred, ninety-five (195) pounds. She was diagnosed with edema of her left hand and right leg. She was prescribed Lasix and Mobic and instructed to follow a low-salt diet. Blood work was ordered (R. 210-11).

On May 23, 2006, Tina M. Yost, Ed.D., a licensed psychologist, completed a Psychological Evaluation of Plaintiff. According to Ms. Yost, Plaintiff was forty-two years old at the time of the evaluation; she stood five feet, seven inches (5/7") tall and weighted one-hundred, ninety-two (192) pounds. Ms. Yost noted Plaintiff resided with her "boyfriend and her 6-year-old granddaughter." Plaintiff's chief complaint was for "'[a]rthritis.'" Plaintiff stated she experienced "pain 'all over.'" Plaintiff denied feelings of hopelessness. She stated that, "'[o]nce in a great while,'" when she was "'fed up,'" she felt "'what's the use'" (R. 234).

Plaintiff reported she medicated with Prevacid, Remeron, Mobic, and Advair. Plaintiff smoked one and one-half packages of cigarettes per day; she drank one pot of coffee per day. Plaintiff reported she attended high school until the seventh grade; she left due to pregnancy.

6

Plaintiff did not obtain her GED. She was "retained in the first grade." She "received special education throughout her academic career." Plaintiff did not participate in extracurricular activities. When living in Louisiana, Plaintiff passed her written examination to obtain her driver's license at the age of fifteen (15). When she relocated to West Virginia, "she required approximately 16 attempts before she was able to pass the exam in 1993" (R. 234-35).

Plaintiff reported she worked as a waitress for three years and certified nursing assistant for twenty years. She volunteered at a nursing home, where she received her training. She was unable to pass the CNA test, but she was "grandfathered in as a CNA." Plaintiff last worked as an assistant to "her boyfriend's mother," who operated a "private 'board and care'" facility. This business was closed in 2005; Plaintiff had not worked since that time (R. 235).

Plaintiff's parents were divorced. She was "'raped' by her father at age thirteen. She got pregnant and had a baby." At age fifteen, she left West Virginia and moved to Chicago to live with an uncle. Shortly after that move, she relocated to Louisiana to live with an aunt. She married in 1979 and divorced in 1986. This marriage produced two children; Plaintiff had regular contact with these children. Her firstborn had no contact with Plaintiff; when he learned, after a DNA test, that his grandfather was his father, he severed ties with Plaintiff. His daughter was being reared by Plaintiff. She had been living with Plaintiff since she was born and was six (6) years old at the time of the evaluation. Plaintiff remarried in 1991 and divorced in 1993. Plaintiff had lived with her "current boyfriend since October 1993." He was unemployed; he was "'disabled'" (R. 235).

Plaintiff listed her activities of daily living as follows: rose at 5:30 a.m. during the week; readied her granddaughter for school; drank coffee; watched "'TV a little bit'"; did laundry; took out dog; did her own housework and cooking; "[went] over" homework with six-year old granddaughter

when she returned from school; fed her granddaughter; watched American Idol or Spongebob with her granddaughter; retired between 9:00 p.m. and 11:00 p.m. Plaintiff shopped; she maintained social contact with family members; slept adequately with medication. Her appetite was good and she had gained a "significant amount of weight the past one year" (R. 235).

Plaintiff's behavior/attitude were cooperative. Her social examination was "within normal limits." Plaintiff's speech was normal and clear. Her ability to communicate was adequate. Plaintiff was oriented, times four. Plaintiff's mood was within normal limits; her affect was full; her thought process and content were normal; her perception was normal; her insight was low average; her judgment was moderately deficient; her immediate and remote memories were within normal limits; her recent memory was mildly deficient; her concentration was mildly deficient (based on WAIS-III results); she had no suicidal/homicidal ideations (R. 236).

Plaintiff's WAIS-III results were as follows: verbal IQ was 72; performance IQ was 79; full-scale IQ was 74. The results were considered valid (R. 236). Plaintiff's WRAT-III results were as follows: reading - grade 8; spelling – grade 3; arithmetic – grade 5. The results were valid. Ms. Yost diagnosed the following: Axis II – borderline intelligence functioning; Axis III – arthritis, by self report. Ms. Yost found Plaintiff's prognosis was fair, concentration was mildly deficient, persistence and pace were within normal limits, immediate memory was within normal limits, and recent memory was mildly deficient. Plaintiff could manage her own finances (R. 237).

On June 5, 2006, Dr. Susan Garner completed an Internal Medicine Examination of Plaintiff. Plaintiff's chief complaints were for "back injury, arthritis, stomach problems, and bowel problems." Plaintiff reported neck pain since 1994, at which time she had three herniated disks. She underwent a diskectomy and surgical fusion in 1995. Her pain was not relieved; she experienced more pain post

procedure. Plaintiff stated "nothing" helped her pain. A March, 2006, x-ray showed arthritis or degenerative disk disease of the neck. Plaintiff described her pain as "burning and stinging and constant." Plaintiff's pain radiated from her neck to her left arm. Plaintiff stated she experienced numbness, tingling, but no weakness in her left arm. Turning her head exacerbated her neck pain. Plaintiff informed Dr. Garner she had not been treated by a chiropractor, physical therapist or pain manager for her condition (R. 238).

Plaintiff stated she was diagnosed with diverticulitis and her most recent "flare up" was three months prior to the examination. Plaintiff did not experience weight loss or reduced appetite. Plaintiff reported she had gastroesophageal reflux disease, esophagitis and a sliding hiatal hernia. Plaintiff reported she had asthma and hypertension. Plaintiff medicated with Cipro, Flagyl, Prevacid, Remeron, Premarin, Advair Diskus, Mobic and Mylanta. Plaintiff stated she had had cervical disk surgery, bronchoscopy and biopsy, exploratory laparotomy, hysterectomy, and right carpal tunnel release (R. 238-39).

Plaintiff smoked one and one-half packages of cigarettes per day; she did not use alcohol; she completed the seventh grade in public school (R. 239).

Plaintiff reported chronic cough with sputum and wheezing, no cardiovascular, genitourinary, or neurological symptoms (R. 239). Dr. Garner did not review any medical records. Plaintiff's gait was normal. She had no difficulty rising from a seated position. She could climb up on and down from the examination table. Plaintiff was comfortable in the seated position, but she complained of neck pain when lying in the supine position. Plaintiff spoke understandably and had no difficulty hearing and following direction. Dr. Garner noted Plaintiff was five feet, three and one-half inches (5'3 ½") tall. She weighted one-hundred and ninety-two pounds. Her blood pressure was 120/80

(R. 240). Dr. Garner's examinations of Plaintiff's HEENT, neck, chest, cardiovascular, abdomen, extremities, arms, hands, knees, ankles, feet, lumbosacral spine/hips, and neurologic produced normal results. There was tenderness over the spinous processes in Plaintiff's cervical spine from C2 to C6. Plaintiff had discomfort with forward and side flexion. Plaintiff could rotate her neck forty (40) degrees to the right and the left. She complained of pain with neck extension. There were no paravertebral muscle spasm or tenderness (R. 240-41). Plaintiff's deep tendon reflexes were normal. She was able to heel walk, toe walk, heel-to-toe walk, and squat (R. 241). Plaintiff's ranges of motion examination of her shoulders, hips, lumbar spine, elbows, wrists, and knees were within normal limits. Her grip strength was normal (R. 243-44). Plaintiff's cervical spine ranges of motion were normal; there was pain on lateral flexion. Her rotation was forty degrees on the right and sixty degrees on the left. Her lower extremity muscle strength was normal (R. 244).

Dr. Garner's impression was for "cervical neck pain, status post fusion, probable degenerative disk disease." She diagnosed "nonspecific abdominal pain" (R. 241).

On July 7, 2006, Atiya M. Lateef, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 265). Dr. Lateef found Plaintiff could occasionally climb rams/stairs, balance, stoop, kneel, crouch, and crawl. He found Plaintiff could never climb ladders, ropes or scaffolds (R. 266). Dr. Lateef found Plaintiff had no manipulative, visual or communication limitations (R. 267-68). Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, and noise. Plaintiff should avoid concentrated exposure to extreme cold, vibration, fumes, odors,

dusts, gases, poor ventilation, and hazards (R. 268). Dr. Lateef reviewed the records from Plaintiff's February 22, 2005, surgery; May 13, 2005, bone density scan, which was normal; March 4, 2005, myocardial perfusion scan, which was normal; Dr. Garner's June 16, 2006, examination records; March, 2006, lumbar spine x-ray; and Plaintiff's ADLs (R. 271).

On October 24, 2006, Bob Marinelli, Ed.D., a state-agency psychologist, completed a Psychiatric Review Technique of Plaintiff. He found she had an organic mental disorder, borderline intelligence functioning (R. 272-73). Dr. Marinelli found Plaintiff's restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace caused mild degrees of limitations. Dr. Marinelli found Plaintiff had had no episodes of decompensation (R. 282). Dr. Marinelli noted Plaintiff's concentration was mildly deficient; her persistence and pace were within normal limits; her memory was within normal limits to mildly deficient. He noted Plaintiff did "not need reminders" (R. 284).

On November 2, 2006, Marcel Lambrechts, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Lambrechts found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 287). Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds; balance; stoop; kneel; crouch; and crawl (R. 288). Plaintiff had no manipulative, visual or communication limitations (R. 289-90). Dr. Lambrechts found Plaintiff was unlimited in her exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid concentrated exposure to extreme cold and heat, vibrations, and hazards, according to Dr. Lambrechts (R. 290). Dr. Lambrechts noted Plaintiff's

"symptoms seem[ed] magnified. She complain[ed] of her back ever since she had discectomt (sic) in 95. No ROM were given but she claim[ed] that she ha[d] pain everywhere and mostly in her back. She seem[ed] depressed but at a psych. evaluation she did not seem to participate as expected. Her evaluation was declared 'not valid.' I question the possibility of firomyalgia (sic) on account of her depressed attitude and her many pain symptoms. She seem[ed] to also suffer from diverticulitis and abdominal pain. Finally, she recntly (sic) had some swelling in hand and leg and was given a diuretic! No comments were RFC is reduced as noted" (R. 291). Dr. Lambrechts noted Plaintiff had "back injuries, arthritis, stomach problems, bowel problems, some education, depression, back pain, asthma, headaches, diverticulitis, pain in hands" (R. 293).

On November 28, 2006, Plaintiff presented to Family Practice of United Hospital Center with complaints of tingling, numbness and pain in her legs. She reported swelling, sliding hiatal hernia, histoplasmosis, arthritis, hypertension, diverticulosis, depression, and sleep disorder. Plaintiff medicated with Mobic, Premarin, Prevacid, Lasix, Flovent, Advair, Prozac, Mylanta, and hydrochlorothiazide. Plaintiff took Remeron "for sleep" (R. 294). Plaintiff's weighed two-hundred (200) pounds; her height was listed as five-feet, six inches (5'6") (R. 295).

On December 12, 2006, Plaintiff presented to the Family Medicine Department of United Hospital Center. She described her pain as stabbing. She said it was exacerbated by lifting and that "not much" made it "better." Plaintiff stated her pain was an eight on a scale of zero to ten (R. 296). Plaintiff stated her pain was in her legs. Her blood pressure was 130/90 (R. 297).

Plaintiff presented to the Family Practice of United Hospital Center on December 12, 2006. Dr. Courtny prescribed Lasix for swelling, Flovent for histoplasmosis, Advair, Mobic for arthritis, Prevacid and Mylanta for hiatal hernia, Prozac for depression, Remeron for sleep, and Premarin.

Plaintiff was instructed to stop smoking. Plaintiff's weight was one-hundred, ninety-six (196) pounds; her height was listed as five-feet, six inches (5'6") (R. 298).

On January 22, 2007, Plaintiff presented to Health Access as a new patient. Her height was registered as five-feet, four and one-half inches (5'4 ½") and her weight was listed as one-hundred, ninety-five pounds. Plaintiff reported she medicated with hydrochlorothiazide, Meloxicam, Premarin, Fluoxetine, Advair, Flovent, Prevacid, and Lasix. Plaintiff stated she medicated with Remeron as it help[ed] [her] sleep" (R. 378).

Plaintiff's February 20, 2007, chemistry and hematology profiles were normal (R. 341-43).

Plaintiff's March 12, 2007, chemistry profile was normal (R. 344).

Plaintiff returned to Health Access on March 12, 2007. She was advised to lose weight, cease smoking, reduce her caloric intake by eating fresh fruits and vegetables. She was instructed to return in six to eight months (R. 378-79).

On April 23, 2007, Plaintiff presented to Health Access with complaints of "persistent" stomach pain (R. 379-80). She stated she had no aggravating factors and that food did not exacerbate the pain. Her abdomen was tender and obese. A bone density test was ordered. She was diagnosed with GERD (R. 380).

On April 25, 2007, Plaintiff had a bone density scan. It was normal (R. 318-19).

Plaintiff's bacteriology profile, completed on May 1, 2007, was normal (R. 345-47).

On May 4, 2007, Plaintiff returned to Health Access. It was noted her bone density was normal (R. 380).

On May 4, 2007, a lactose tolerance study was completed on Plaintiff. Her fasting glucose tolerance was 116; glucose tolerance at one-half hour was 168; glucose tolerance at one hour was

173; and glucose tolerance at two hours was 112 (R. 348).

On June 4, 2007, Plaintiff presented to United Hospital Center's emergency department with complaints of headache and shoulder pain. She was diagnosed with migraine headache. She was treated with Reglan and released to home (R. 361-66).

Plaintiff's June 4, 2007, chemistry and hematology profiles were normal (R. 350-52).

On June 4, 2007, Plaintiff had a CT scan performed on her head. It was normal (R. 320).

On June 5, 2007, Plaintiff had an x-ray made of her lumbar spine. It showed "minimal degenerative change in the mid lumbar region with intervertebral disc spaces well preserved." There was "[n]o acute bone or joint abnormality . . . seen" (R. 245).

On June 7, 2007, Plaintiff presented to Health Access and reported she had collapsed, had been taken to the emergency department, and was told she could have had a mini stroke. Plaintiff's height was listed as five feet, four and one-half inches (5'4 ½") and her weight was one-hundred, ninety-five (195) pounds. Plaintiff reported "continued numbness" in her left arm "from shoulder down and left leg." Plaintiff had "good strength" in her left extremities. It was noted that her CT scan was normal. Plaintiff was instructed to "disc[ontinue] HCTZ" and "recheck K in 2 weeks." Plaintiff was to continue with her other medications (R. 381).

On July 7, 2007, a state-agency psychologist, Philip E. Comer, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found a residual functional capacity ("RFC") assessment was necessary and Plaintiff had an organic mental disorder, namely borderline intelligence functioning (R. 250-51). Dr. Comer found Plaintiff restrictions of activities of daily living and difficulties in maintaining social functioning would cause mild degrees of limitations. Dr. Comer found Plaintiff's difficulties in maintaining concentration, persistence, or pace would

cause a moderate degree of limitation. Dr. Comer found Plaintiff had experienced no episodes of decompensation (R. 260). Dr. Comer relied on the records of Ms. Yost in noting Plaintiff alleged she had "'some education'" in that she finished seventh grade and was in special education classes. Dr. Comer noted Plaintiff's IQ scores as verbal – 72; performance – 79; and full scale – 74. He also noted Plaintiff's WRAT-III scores in reading (83), spelling (60) and math (74). He noted Plaintiff had a diagnosis of borderline intelligence functioning and there "appear[ed] to be no marked restrictions" in her activities of daily living. Dr. Comer opined that Plaintiff's diagnosis of borderline intelligence functioning "call[ed] for a RFC assessment" and that Plaintiff was credible (R. 262).

On July 7, 2007, Dr. Comer completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff was not significantly limited in the following abilities: remember locations and work-like procedures, understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from superiors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. Dr. Comer found Plaintiff was moderately limited in the following abilities: understand and remember

15